UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

TAJIEN WHITE,
    Petitioner

V.                        CIVIL ACTION NO. 03-12388-RGS

COMMONWEALTH OF MASSACHUSETTS
    Respondent.

## MEMORANDUM OF PETITIONER

The petitioner has filed a petition for writ of habeas corpus alleging a Constitutional violation during State court proceedings. Specifically, the petitioner claims that the judgments of conviction were obtained in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States in that his statement, which was given without understanding of or waiver of rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), was introduced against him at trial.

## STATEMENT OF THE CASE

The petitioner was charged in three indictments with statutory rape, i.e. natural sexual intercourse, oral and digital. Prior to trial the petitioner filed a motion to suppress statements he made to the police. The motion was denied. Thereafter, the petitioner opted for a jury-waived trial; however, prior thereto, he filed a motion for the trial judge to reconsider the ruling on the motion to suppress. The motion was denied.

Trial commenced on September 5, 2000. On September 11, 2000, the trial judge found the petitioner guilty on all three indictments. From the judgments of conviction, the petitioner appealed.

On May 20, 2003, in a Memorandum and Order pursuant to Rule 1:28 of the Appeals Court Rules, the judgments of conviction were affirmed. Commonwealth v. White, 58 Mass. App. Ct. 1103 (2003), 788 N.E. 2d 1021. Thereafter, the petitioner sought further appellate review in the Supreme Judicial Court. Review was denied. Commonwealth v. White, 439 Mass. 1110 (2003), 793 N.E. 2d 375. The instant petition for writ of habeas corpus followed.

## STATEMENT OF FACTS

In February of 1998, the petitioner was a junior at Belmont High School. He was a METCO student. At that time the complainant, Erin Marie Woodbury, was a freshman at Belmont High School. (Tr.1-15). She met the petitioner in January, at which time they exchanged telephone numbers. (Tr.1-17).

Winter vacation commenced on February 16, 1998. On that date the petitioner, according to the complainant, called her and asked if she would like to go to a party that night at the home of Adam Buchanan. She agreed. (Tr.1-20).

When they arrived at the party, they went immediately to the basement where they observed a large number of people. According to the complainant, the petitioner gave her a beer; then another. (Tr.121).

The petitioner went upstairs, leaving the complainant in the basement. She then finished a third beer and got herself another. (Tr.1-22).

Thereafter, the petitioner returned and they went upstairs to the TV Room and sat on the couch. The petitioner kissed her and put his hand down her pants. (Tr.1-24). The couple then went upstairs to the bathroom in the bedroom section of the house. According to the complainant, she sat on the toilet and the petitioner put his penis in her mouth. (Tr.1-25). Also, the petitioner took off one leg of her jeans and panties; sat on the edge of the bathtub and inserted his penis into her vagina. (Tr.1-26).

While in the bathroom, the couple did not lock the door. While they were inside, Kelly Leisman opened the bathroom door for a brief moment. She observed the petitioner to be standing up; and, she observed the complainant to be getting up, either from a sitting or kneeling position. (Tr.2-73-74).

The complainant started to bleed. Drops of blood fell on the floor. (Tr.1-28). Thereafter, the couple returned downstairs. The complainant sat on a couch, next to Michael Savas. According to Savas, she mumbled something about hooking up with the petitioner. (Tr.1-158). Later, Savas asked the petitioner if he had had sex with the complainant. The petitioner denied it, saying he did not have a condom and would not do so without one. (Tr.1-161).

After the party the complainant was taken home in a car driven by Matt Salmon. She and the petitioner sat in the back seat. (Tr.1-29).

The next night, after conversation with her father and grandmother, the complainant went to the Mount Auburn Hospital for an examination. Dr. Sharlene Adamson, an emergency physician at the hospital, examined her. Dr. Adamson observed a small laceration in the opening on the vagina. (Tr.1-103). Patti Duggan, a nurse at the hospital, did a rape kit. (Tr.1-118-120).

DNA analysis reveals that the petitioner could not be excluded. According to the report, numerically, the petitioner, an African-American, was one in thirteen. This meant that, "if you have a room with thirteen African-American individuals, you would expect to come across someone who could have contributed to this mixture appropriately at one time." (Tr.2-53).

Detective Kevin Shea of the Belmont Police Department gave testimony concerning the statement given by the petitioner at the Belmont Police Station. The statement was recorded. A tape of the statement and a transcript thereof, were introduced. A this point, the

court was reminded that neither the tape nor transcript were available at the time of the hearing on the motion to suppress. (Tr.2-88).

During the course of the statement, the petitioner denied having vaginal and oral intercourse with the complainant. He admitted to digital intercourse.

### REASONS FOR GRANTING THE WRIT

It is now well settled that a person in State custody can obtain habeas relief only if the State court decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Williams v. Taylor, 529 U.S. 362 (2000). The instant case involves a statement made by the petitioner to the police, as to which the Supreme Court has said that there is a requirement of warnings and waiver of rights. Miranda v. Arizona, 384 U.S. 436 (1966), Johnson v. Zerbst, 304 U.S. 458, 464 (1938). And, in reaching a decision on whether or not a statement is voluntary, with a valid waiver, the totality of the circumstances must be considered. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). It is this Supreme Court precedent upon which the petitioner relies.

Viewing the matter under the totality of circumstances analysis, in accordance with Schneckloth v. Bustamonte, supra, it would appear that there was no valid waiver of rights; nor was the statement of the petitioner voluntary beyond a reasonable doubt.

The petitioner was interviewed by Detective Kevin Shea at the Belmont Police Station on February 20, 1998. He was seventeen years old at the time, having been born on June 26, 1980. (Tr. 4 of motion to suppress). At that time he was a junior at Belmont High School. He was a METCO student who had attended the Belmont Schools since the first grade. (Tr. 40). At some point he was evaluated in connection with his learning capacity. (Tr. 40). He scored low on all of the tests. As a result, it was determined that he had a problem understanding what he read. (Tr. 41). Consequently, he was placed in a Special Needs Program. (Tr. 40).

Notwithstanding this disability, the petitioner was a very popular student. He was president of the junior class and member of the student council. (Tr.46). He also played on the football and basketball teams. (Tr.47). However, when he ran for elective office, his campaign speeches were written for him because he did not know to go about it. (Tr.49-50). He also took the SAT exam but had to be allowed extra time. (Tr.51).

On February 20, 1998, the petitioner heard from a friend that the Belmont Police wanted to talk to him. He and a friend drove to the Belmont Police Station, arriving about 2:00 p.m. At that time he had no knowledge that a complaint of rape had been made against him. The petitioner, upon arrival at the station, was taken to a back room and told to stay there until Detective Shea arrived. A police officer remained outside the door of the room; and, the petitioner's friend was told that

she had to wait out front. Detective Shea arrived about 5:00 p.m. Thereafter, the petitioner was taken upstairs for interrogation.

Prior to interrogation, Detective Shea was aware that the complainant had said the petitioner raped her; and, he had commenced an investigation, which included interviewing more than twenty people. (Tr.24). More importantly, at the time of the interview, Detective Shea knew that he had probable cause to arrest petitioner. (Tr.25).

To be sure, Detective Shea gave the Miranda warnings to the petitioner; however, the petitioner responded that here was one thing he did not understand. (Tr.14). Despite the lack of understanding, no further explanation was provided. As to this lack of understanding, the transcript clearly shows what occurred (copy of pertinent portion attached herewith as an addendum and the complete transcript is attached to the petition).

To be valid, a waiver must be voluntary in the sense that it is the product of a free and deliberate choice; and, the waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon the right. This was made clear in Johnson v. Zerbst, supra. A statement can be voluntary in the legal sense only if the suspect actually understands the import of each Miranda warning. Miranda v. Arizona, supra at 467-476. Clearly, the petitioner in the instant case did not understand his rights.

When asked if he wished to waive the Fifth Amendment right, the petitioner said he did not know what that meant. Rather than explain the Fifth Amendment, Detective Shea simply said that he wanted to talk to the petitioner about the party; that he had talked to everyone else who was at the party; and, that he was giving the petitioner an opportunity to explain what happened. With this, the petitioner said he would explain it.

Having in mind that the Commonwealth bears the burden of proving a knowing an voluntary waiver; that every reasonable presumption against waiver will be indulged; and, that the totality of the circumstances test is to be employed, Johnson v. Zerbst, supra, the petitioner asserts that his statement and waiver of rights was not voluntary.

The petitioner was a seventeen-year-old high school student, who could be characterized as being "slow." He had no prior experience with the criminal justice system. He had no knowledge as to why the police wanted to see him prior to going to the police station; and, clearly, he did not understand the full import of the Fifth Amendment. While, ordinarily, no single factor is conclusive on the issue of waiver, the fact that the petitioner did not understand the Fifth Amendment is. After all, that is what the warnings are all about. If there is no understanding, there can be no valid waiver.

## CONCLUSION

For the foregoing reasons, the order of the district court denying the petition for writ of habeas corpus should be reversed. The case should be remanded to the district court with instructions to issue the writ.

By his attorney,

*/s/ Willie J. Davis*

WILLIE J. DAVIS
BBO#: 116460
Davis, Robinson & White
One Faneuil Hall Marketplace
Boston, MA 02109
(617) 723-7339

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on August 4, 2004, 2004.

*/s/ Willie J. Davis*
WILLIE J. DAVIS